GOODWIN

William J. Harrington
+1 212 459 7140
WHarrington@goodwinlaw.com

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

goodwinlaw.com
+1 212 813 8800

August 27, 2021

The Honorable J. Paul Oetken
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

**Re: <u>United States</u> v. <u>Scott Mangini</u>, 20 Cr. 162 (JPO)**

Dear Judge Oetken:

We represent Scott Mangini, and we submit this sentencing letter on his behalf.

Mr. Mangini pled guilty on April 23, 2021, to one count of conspiring to distribute adulterated and misbranded drugs in violation of Title 18, United State Code, Section 371. Mr. Mangini admitted that he conspired make and sell products on websites, including products like omeprazole, that should have been FDA approved but weren't. He also admitting knowing that the businesses were organized to make it harder for the FDA to identify the people involved in the businesses, and that this was illegal.

We respectfully submit that a non-guideline sentence is appropriate in this case, and specifically we request 6 months home confinement. There are several reasons for this:

- First, Mr. Mangini fully accepted responsibility in this case. Prior to his guilty plea, Mr. Mangini met with the Government on two occasions to explain his participation – and guilt – in this matter. He also authorized his attorneys to make multiple presentations to the Government that detailed his businesses. The Government ultimately based its superseding indictment – to which Mr. Mangini plead guilty – on details it heard from Mr. Mangini in these interviews. The information provided by Mr. Mangini also resulted in the arrest of others.

- Second, Mr. Mangini has been substantially punished because he has been financially ruined by this prosecution. He is the sole financial support for his wife and young step-son. He can no longer practice in the only careers he knows – training horses and making animal pharmaceuticals. His retirement savings have been decimated by his need to support his family over the last two years without gainful employment during a pandemic. At 56 years old, Mr. Mangini essentially has to start over building a skill set to contribute economically to his family. The Government also used its discretion to demand a forfeiture order in the amount of $8,108,141.65 – an amount far more than he has earned in his lifetime. While the Government has the authority under the forfeiture

GOODWIN



laws to impose such a forfeiture, it did not have to do so and the forfeiture is plainly disproportionate for Mr. Mangini as it guarantees he will remain forever impoverished.

- Third, Mr. Mangini's actions of distributing misbranded drugs, though criminal, are rarely charged by federal prosecutors and are usually handled through administrative proceedings. This is especially so where, as here, the products sold by Mr. Mangini were exactly what they were represented to be and were not dangerous, as set forth below in greater detail. The guidelines' recommendation of 60 months' incarceration does not account for these factors, and in fact is largely driven by the total value of the products sold by Mr. Mangini's co-conspirators – and not the much smaller amount of personal profit that Mr. Mangini received. Thus, a lengthy sentence of incarceration would not be a proportionate sentence for Mr. Mangini. Indeed, the economic harm and reputational damage he has already suffered is greater than most similarly-situated persons disciplined by the federal government for misbranding.

- Fourth, Mr. Mangini's co-defendant, Scott Robinson, engaged in offense conduct that was categorically worse than Mr. Mangini's. Mr. Robinson sold a much greater range of products, including steroids and other dangerous products, over a longer period of time to animal and human users. Mr. Mangini only sold limited products to Mr. Robinson, and only for less than 3 years of Mr. Robinson decade-long business. Thus, Mr. Mangini deserves a sentence substantially less than the 18 months' incarceration imposed on Mr. Robinson.

- Fifth, the unwarranted damage to Mr. Mangini's public reputation warrants a lower sentence. The U.S. Attorney's Office issued an inflammatory press release after Mr. Mangini's guilty plea claiming that he sold performance enhancing drugs, assisted in the abuse of racehorses, and corrupted the industry. The Government's media statement then was unquestioningly repeated at length on various news programs like 1010 Wins. The claims that Mr. Mangini abused animals or corrupted any horse races is false and unproven. These allegations have permanently damaged Mr. Mangini who has been branded as a notorious horse doper and will have his future employment prospects substantially limited as a result.

Given these factors, the defense respectfully submits that a non-Guidelines sentence of 6 months' home confinement satisfies the sentencing goals for 18 U.S.C. § 3553(a).

## I. Relevant Facts

### A. Overview

We have attached letters from Mr. Mangini as well as letters of support from some of his friends and families. *See* Exhibits A and B. Those letters discuss Mr. Mangini's background, including his upbringing in a blue collar family, his decision to study for a pharmacology degree at Rutgers, where he graduated in 1988, and his 40-year career as a pharmacist. For some of that time – between 2009 and

GOODWIN



2014 – Mr. Mangini worked as a trainer for racehorses. His interest in animal pharmacology arose after a horse he owned died from a crippling parasite. The letters also describe how Mr. Mangini later became involved in the sale of pharmaceutical products over the internet and then founded a compounding pharmacy. Mr. Mangini's letter also describes his regret and contrition. He reflects on the fact that he will never again work with horses or practice as a pharmacist. He also describes his worry about how his case will affect his wife of 3 years, who recently immigrated to the United States, and his 11-year-old step son, whose biological father was murdered.

Of particular relevance to his offense, Mr. Mangini used his training as a pharmacist to make and sell drugs for animals since about 2011. The products he made were safe.[1] They contained the active ingredients that were promised and advertised.[2] And the products he sold are well-recognized as a reliable part of care for animals, including horses.

Mr. Mangini's business was illegal because he did not adhere to applicable FDA regulations for the products that he made and sold. For example, his internet businesses sold an omeprazole paste that could be used as an injectable product. Under FDA rules, he should have sought approval from the FDA by, for example, submitting an Abbreviated New Drug Application which authorizes the manufacture of generic drugs by a new party. For his compounding pharmacy, Mr. Mangini did not need FDA approval for the omeprazole paste that he made, but he did need to maintain proper prescriptions for the drugs. He did not always adhere to this standard, and in some cases recorded prescriptions where there were none. In both instances, Mr. Mangini cut regulatory corners and violated the relevant prohibition against selling misbranded and adulterated drugs.

Mr. Mangini did not appreciate the seriousness of his actions and he offers no excuse for that. He recognizes that he utterly failed to appreciate the significance of these regulatory crimes. He and his family are now paying a heavy price.

However, Mr. Mangini never conspired to sell illegal performance enhancing drugs.[3] The products he made and sold were allowable under horse racing rules because they are used to address routine health problems suffered by animals, including horses. The products have valid therapeutic purposes. Mr. Mangini did not make or sell drugs used for illegal doping by human or animal athletes. He did not make anabolic steroids, human growth hormone, erythropoietin, or other commonly abused substances. He did not make or sell controlled substances, like narcotics.

---

[1] The Government's multi-year investigation of Mr. Mangini did not produce a record of horses or other animals who suffered harm as a result of Mr. Mangini's products, an extraordinary fact given that Mr. Mangini made and sold animal drugs since 2011.

[2] The Government ordered from one of the online pharmacies and tested the products, confirming that the product contained the active ingredients that had been advertised.

[3] The Government provided an expert report from Dr. Cynthia Cole on February 11, 2021. That report discusses the uses and characteristics of many products, including some made and sold by Mr. Mangini. The report never describes a product sold by Mr. Mangini as being a performance enhancing drug prohibited by horse racing rules.

GOODWIN



**B. Mr. Mangini's Business Activities**

Mr. Mangini made and sold drugs and nondrug products through a number of distinct avenues.

From 2011 to 2012, Mr. Mangini formulated products – primarily an ulcer drug called Gastromax – for Scott Robinson, who in turn manufactured, marketed and sold it through a website known as Horsegold. Mr. Robinson had been in the business since 2007.

From 2013 to 2017, Mr. Mangini operated a compounding pharmacy under the corporate entity of Ergogenics. This was the primary business where Mr. Mangini was an active participant.

From late 2014 to 2016, Mr. Mangini sold products to Mr. Robinson. In total Mr. Mangini sold products to Mr. Robinson for only several years (2011 to 2012 and late 2014 to 2016), though because of the conspiracy rules, his guidelines amount includes the entirety of sales the Government has attributed to Mr. Robinson – approximately $3.8 million.

From 2015 through March 2020, Mr. Mangini at first assisted and later had a financial interest in an internet pharmacy known as racehorsemeds.com. In 2015, Mr. Mangini provided formulas to the owners of the website. He was not compensated for this. Later, he became a joint owner of racehorsemeds.com when his jointly-owned business, Pegasis, purchased the website. Eventually, Mr. Mangini also arranged to have the business use his personal Paypal account. He was not otherwise regularly or actively involved in the business during this time.

By the time of his arrest, Mr. Mangini was not actively making, marketing, or selling any products and had not been for several years. He was still a part of owner of Pegasis and continued to receive a salary for the products sold through that website, but the business was operated by others.

**C. Products Sold**

The nature of Mr. Mangini's business can be demonstrated by an analysis of the main products sold. For example, in 2019, Pegasis was selling products through an internet pharmacy. A review of the top ten products demonstrates that none these products is a banned, performance enhancing substances. Instead, they are common drugs with valid therapeutic purposes:

| | | |
|---|---|---|
| Omeprazole Oral Paste 2.28gm | 17.4% | Treats equine stomach ulceration. One dose is normally given daily for one month, followed by a second month at a quarter of the dose rate. |
| Pentosan Gold 50ml | 7.1% | Concentrated anti-inflammatory and stimulant of cartilage synthesis, repair and protection. (Pentosan plus glucosamine) |
| Omeprazole/Misoprostol Oral Paste | 5.2% | See above |

GOODWIN



| | | |
|---|---|---|
| Pentosan 250mg/ml 50ml | 4.2% | See above |
| Toltrazuril Oral Suspension 5% 900ml | 3.9% | For the treatment of preclinical coccidiosis due to Isospora suis in neonatal piglets, for the prevention of clinical signs of coccidiosis and reduction of coccidian shedding in lambs on farms with a confirmed history of coccidiosis caused by Eimeria crandallis and Eimeria ovinoidalis, and for the prevention of clinical signs of coccidiosis and reduction of coccidian shedding in calves on farms with a confirmed history of coccidiosis caused by Eimeria bovis and Eimeria zuernii. |
| Pentosan Platinum 18ml | 2.6% | See above (pentosan plus glucosamine plus hyaluronic acid) |
| Toltrazuril Oral Suspension 5% 200ml | 2.6% | See above |
| Lactanase | 2.0% | Enzymic modulator to reduce lactic acid accumulation. |
| Toltrazuril Oral Suspension 5% 1 Gallon | 2.0% | See above |
| Clenbuterol Gold Oral Syrup | 2.0% | Management of horses affected with airway obstruction, such as occurs in chronic obstructive pulmonary disease. |
| **Total** | **49%** | |

All of these drugs are safe, they have valid therapeutic purposes, they are not illegal performance enhancers for athletes, and their administration is not banned by racing authorities. To take the example most prominent on this list, Omeprazole was the largest revenue generator and, in all forms, accounted for 22.4% of sales. Omeprazole treats ulcers in animals. The drug also works in people and can be bought over the counter in pharmacies through New York City. It is not a

performance enhancing drug:

> "Omeprazole does not appear to improve physiological markers of performance in healthy, ulcer free horses. These data may benefit various authorities responsible for deciding administration and timing policies of omeprazole as well as clinicians and horse owners."

See Effect of omeprazole on markers of performance in gastric ulcer-free Standardbred horses August 2006, Equine Veterinary Journal 38(36):668-71. The administration of Omeprazole is explicitly permitted by racing authorities. For example, the New York racing rules, applicable to the Belmont Racetrack, enumerate restrictions for the use of drugs, medications, and other substances to racehorse. Those rules explicitly enumerate Omeprazole as one of the "substances [that] may be administered by any means until 24 hours before the scheduled post time of the race in which the horse is to compete." *See* 9 NYCRR § 4043.2(c)(5).

The internet pharmacy sales were driven not because they involved banned substances, but rather because the internet site provided an easy, low-cost option. For example, name-brand Omeprazole products will cost $30-36 per tube, while Mr. Mangini's sites sold it for $9.99/tube. As a result, the customers of the website represent a broad cross section of animal hospitals, clinics, humane societies, animal rescues, and veterinarians, and included entities that treated not just horses, but also dogs, goats, llamas, alpacas, lambs, and livestock.

**III. The Appropriate Sentence**

Mr. Mangini respectfully requests a non-Guidelines sentence of 6 months' home incarceration.

At the outset, the Court should not follow the Guidelines' sentence for this offense, because the Guidelines calculates its recommendation in a mechanical way that does not account for the seriousness of the offense at issue. As set forth in the parties' plea agreement, the Guidelines recommend a sentencing range of 87 to 108 months, which is capped at the statutory maximum sentence of 60 months incarceration. The Guidelines look to the total amount of sales pursuant to U.S.S.G. § 2B1.1 Note 3 (F)(v), which require that "goods for which regulatory approval by a government agency was required but not obtained … loss shall include the amount paid for the property, services or goods … with no credit for the value of those items or services." Because of the breadth of conspiracy laws, Mr. Mangini is also held responsible for all sales by Scott Robinson, even though his involvement with him was limited in time and degree. The Guidelines do not meaningfully distinguish between a case where someone sells a dangerous product that is misrepresented and a case like Mr. Mangini's, where a valid, therapeutic, safe drug was sold to customers as truthfully represented.

Mr. Mangini suggests that a sentence of 6 months' home confinement is sufficient to reflect the fact that in his business activities, which lasted about 8 years, he knowingly violated the FDA regulatory rules by failing to seek approval of certain drugs and by not obtaining necessary prescriptions for the sale of others. It also reflects the fact that the prosecution in the case has already had a devasting

GOODWIN



impact on him: at the age of 56, his business is ruined and he can no longer work in the pharmacy or horse racing industries. While the end of his pharmacy career may be merited, given his conduct, it also means that at an advanced age he has lost the ability to earn money. He is the sole wage earner for himself, his wife and his step-son. To support them since his arrest, he has drained his retirement account. This has triggered tax and penalty obligations which will further reduce his assets, leaving him with few assets as he nears retirement. When this case is over, he will be financially ruined with little chance of economic recovery.

Mr. Mangini's requested sentence is also appropriate given his culpability relative to co-conspirator Scott Robinson. The Court sentenced Mr. Robinson to 18 months' incarceration on March 9, 2021. Mr. Robinson's conduct was much more serious than Mr. Mangini's:

- Mr. Robinson obtained a wide array of drugs from sources other than Mr. Mangini, and these included drugs, such as anabolic steroids and aranesp, that are much more dangerous than anything Mr. Mangini sold to him.[4] Aranesp, for example, is banned by racing authorities except for "extraordinary mitigating circumstances." *See* 9 NYCRR § 4043.12(a)(1)(i). Indeed, Robinson had been court martialed from the Navy after he was found guilty of selling illegal steroids.[5] Mr. Robinson also sold illegal steroids to human athletes.[6] None of these things is true of Mr. Mangini.

- After being confronted by the FBI, Mr. Robinson threatened to obstruct their investigation if he was not permitted to secure the return of items seized from his premises.[7] By contrast, Mr. Mangini agreed to sit with the Government for two interviews and truthfully testified at those meetings. He also authorized his counsel to make multiple presentations to the Government describing the nature of his business and its activities. From the outset, Mr. Mangini acknowledged that he had broken the law, but disputed that he was involved in an effort to corrupt competitive horse racing through the sale of performance enhancing drugs. Mr. Mangini's factual proffers were important to the Government and equipped the Government with information to file a superseding indictment on March 11, 2021, that, based on Mr. Mangini's proffers, advanced theories of misrepresentation other than an effort to deceive horse racing authorities. These new charges served as a basis for Mr. Mangini prompt guilty plea on April 23, 2021.

- Mr. Robinson continued his illegal business even after he learned of the FBI's investigation.[8] By contrast, Mr. Mangini was largely a passive participant in any drug production since closing his compounding facility in 2017, two years before his arrest in

---

[4] *See* Government Sentencing Letter, Docket No. 59, at 3.
[5] *See* Government Sentencing Letter, Docket No. 59, at 2.
[6] *See* Government Sentencing Letter, Docket No. 59, at 5.
[7] *See* Government Sentencing Letter, Docket No. 59, at 2.
[8] *See* Government Sentencing Letter, Docket No. 59, at 7.

GOODWIN



March 2020. Unlike Mr. Robinson, Mr. Mangini engaged in no criminal activity after learning of the FBI's investigation.

These factors demonstrate that Mr. Robinson's conduct is categorically more severe than Mr. Mangini's, and his sentence should be materially lower than Mr. Robinson's sentence of 18 months' incarceration.

Mr. Mangini's requested sentence is also sufficient when considered against the typical enforcement actions against others similarly situated, and indeed, even 6-months home incarceration would put Mr. Mangini on the more punitive end of similarly situated persons. The FDA sets forth guidance for how it utilizes its enforcement powers, and that guidance demonstrates that conduct like Mr. Mangini's rarely warrants criminal indictment let alone a period of incarceration. The FDA has acknowledged that there are thousands of drugs being sold in the United States without the proper regulatory approval having been obtained, and therefore the FDA utilizes a risk-based analysis to govern its enforcement.[9] Specifically, the FDA prioritizes enforcement actions against drugs involving (1) potential safety risks, (2) lack evidence of effectiveness, (3) constitute health fraud drugs, or drugs that challenge the FDA regulatory rules in other ways.[10] Even within those guidelines, the FDA has a range of options it may take short of criminal prosecution, including the issuance of a warning letter or civil seizure actions.[11] There are very few criminal cases involving misbranded drugs that are safe and effective, like omeprazole.

Yet in contrast to most similarly-situated persons against whom the federal government brings enforcement action, Mr. Mangini has already suffered disproportionately. In its discretion, the Government relied on the flexibility allowed by the federal forfeiture laws to impose a forfeiture order of $8,108,141.65 on Mr. Mangini, even though the Government knows he never collected nearly that much money and certainly does not have it. Indeed, this order represents more money that Mr. Mangini has earned in his lifetime from all sources of income. Knowing that he could no longer work either as a horse trainer or a pharmacist, the Government then acted to ensure a lifetime of indigence for Mr. Mangini.[12]

The law permits criminal prosecutions against a much wider range of people for FDA crimes and relies on prosecutorial discretion to pick the right cases. As a result, criminal prosecutions are usually reserved for a class of defendants who are selling dangerous drugs and harming patients. For example, in the case of Ozay Pharmaceuticals, the FDA sought criminal prosecutions of two persons who smuggled counterfeit, misbranded, and adulterated cancer treatment drugs into the United States. Tests showed that some of these purported cancer treatment drugs had no active ingredients.[13] These

---

[9] *See* Exhibit C, FDA Guidance at 3.
[10] *See* Exhibit C, FDA Guidance at 6.
[11] *See* Exhibit C, FDA Guidance at 5.
[12] The forfeiture laws give the Government extraordinary authority in these sorts of cases and rely on the good judgement and discretion of prosecutors to use it properly.
[13] *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/criminal-investigations/criminal-investigations-case-activity (last accessed on August 22, 2021) (Ozay Pharmceuticals)

GOODWIN



defendants, whose actions were undoubtedly far more serious than Mr. Mangini's, were sentenced to 27 months in prison.

Mr. Mangini's conduct is far less serious than the defendants. He was selling an ulcer medication, not a cancer treatment. The other products sold by Mr. Mangini were similarly safe and appropriate. And every test conducted by the Government showed that his products contained the represented active ingredients. A sentence of 6 months' home incarceration is sufficient.

Finally, Mr. Mangini has suffered unwarranted damage to his reputation because the Government's effort to litigate his case in the press. At the time of his guilty plea, the U.S. Attorney issue a press release in which she stated that "Scott Mangini created and flooded the supply side of a market of greed that continues to endanger racehorses through the sale of performance-enhancing drugs. Mangini designed and created dozens of products intended for use by those engaged in fraud and animal abuse."[14] It led the release by describing Mr. Mangini as the "Owner Of Illegal Racehorse Doping Websites" and said he peddled performance enhancing drugs. The Government's press release was designed to give them impression that Mr. Mangini had admitted to endangering racehorses and corrupting the racing industry by selling doping products.[15] This misrepresented his guilty plea.[16] And the U.S. Attorney's Office knew that Mr. Mangini disputed these claims as the Government had filed a superseding indictment to permit a guilty plea that relied on other factual claims. For the prosecutors, the press release's narrative was far more interesting than Mr. Mangini's actual plea allocution and conduct, and as it no doubt expected, the press release was cited in coverage of the guilty plea on these false premises, including by the New York City radio program 1010wins. This effort by the U.S. Attorney's Office to punish Mr. Mangini in the court of public opinion based on conduct that he did not admit also warrants a lower sentence.

---

[14] *See* Exhibit D (https://www.justice.gov/usao-sdny/pr/owner-illegal-racehorse-doping-websites-pleads-guilty-manhattan-federal-court (last accessed on August 27, 2021)).
[15] *Id.*
[16] Mr. Mangini stated: "From the years 2011 through 2020, I agreed with others to make and sell products on websites, including products like omeprazole, that should have been FDA approved but weren't. I knew that the businesses were organized to make it harder for the FDA to identify the people involved in the businesses. At this time -- at that time, I knew that what I was doing was against the law." *See* Plea Transcript, Docket No. 94, at 17.

**IV. Conclusion**

For the reasons set forth in this letter, Mr. Mangini respectfully requests a non-guidelines sentence of 6 months home confinement.

Respectfully submitted,

/s/ William J. Harrington

William J. Harrington

Cc: Mr. Jeff Marcus, Esq.
AUSA Anden Chow, Esq.
AUSA Sarah Mortazavi, Esq.